Case No. 15-1237, et al. Portland General Electric Company Petitioner v. Federal Energy Regulatory Commission. Mr. Acker for Petitioner, Portland General Electric Company. Mr. Christensen for Petitioner, Patuxent Wind Farm. Ms. Wallander for Respondent. Good morning, Your Honors. May it please the Court, I'm Lawrence Acker of the firm of Van Ness Feldman in Washington. I represent Portland General Electric Company. I'm accompanied by my colleague and partner, Gary Bachman. This is not the usual Public Utility Regulatory Policies Act case in which a party files a complaint against the State Commission for failing to observe the requirements of the Act and FERC issues a declaratory order and then skates around whether it's a declaratory order is simply a memorandum of law that has no binding effect. In this case, the complaint was filed against the public utility, Portland General, and FERC said it was operating under Section 210 of the, I'm sorry, under Section 206 and 309 of the Federal Power Act. FERC's order described the requirements and told Portland General what to do. And we thought they did it defectively. They didn't satisfy any of the standards of either Sections 206 or 309. Nonetheless, we were at risk under the Federal Power Act for some pretty hefty penalties of a million dollars a day for any noncompliance. Because of that, Portland General changed its practices and adjusted them. FERC later asserted in an order that we had complied with their directives, which is not the kind of language that you would expect in a memorandum of law type order. Wait a minute, counsel. I thought at this point you really had no beef with FERC. Right. Is that correct? Well... Yes or no? I took your reply brief to say, okay, FERC says what they did is simply a declaratory statement. It has no blinding effect. And I took your reply brief to say, okay, we have no fight. If you had a fight with Wind Farm, but not with FERC. We do have disagreements with the Wind Farm. We know about that. But you're talking first, so I'm asking myself, wait a minute, you don't have any fight with FERC now. Well, as long as this court is going to affirm that FERC's orders were as ineffective as we thought they were... Well, that's what FERC says, right? That's what FERC says. So you don't have any fight with FERC. Is that correct? As long as you agree with FERC that their orders are of no effect, then we don't have a fight with FERC. So why are you up first? I don't know. Why are you a petitioner at this point? Well, we didn't know that until after they filed their brief. Okay. Why? Well, okay. So does that, in technical terms, does that mean you're not a party agreed under 313? Is that what it means, right? If it's declaratory only. You're not agreed, and we don't have jurisdiction, correct? If this is covered by the Midland line of cases, then we wouldn't be a party agreed. You wouldn't have jurisdiction. What do we do? We don't have to even worry about jurisdiction. You don't have a claim at this point. You don't even have a right. Again, as long as you believe that the court, that the FERC's order is ineffective and you say as much, then we're not agreed. With one exception, and that's the FERC's order purported to apply a rule not only to Portland General, but to all other utilities. That's not us. We are utilities, so we can encounter this again. Well, that's speculative. There's one little, I'm sorry. Is that speculative? Well, it's not speculative that they announced the rule that they purported to have generally applicable. What's the rule? The application. What is the rule? Thirty-seven years ago, they promulgated a rule in Order 69. What's the rule that they announced? The rule that they announced is that a utility can't rely on contract language approved by its state commission that restricts the delivery rights, that restricts the payment obligation to power that's actually delivered after it was scheduled. That's inconsistent with the rule that they promulgated 37 years ago after going through the requirement, satisfying the requirements of the Public Utility Regulatory Policies Act of having consultations with state commissions and notice and comment. Wait a minute, Counselor. There's no reason for us to get into that, is there? I mean, at this point, you have no quarrel with FERC. So you really, your quarrel now is with Winform, only with Winform. Is that correct? That's the primary quarrel that's left, yes. Well, speaking of that, then, what do we do? Let's assume we agree with FERC that this is declaratory and it's governed by a midline. What do we do with the Winform's argument about dynamic schedule? Oh, I'd reject it. I would do that summarily. But wait. But do we have jurisdiction to consider it? Do we have jurisdiction to consider it? Well, FERC dismissed that. I'm asking you. FERC said, as I understand it, that that's just a question of state, of the Power Purchase Agreement, right, and the state regulations. They're not going to get into that, right? No, I didn't understand FERC to characterize it that way. Well, what do you think FERC said? I understood FERC to characterize the dynamic scheduling question. By the way, what is dynamic schedule? Can you explain it to us? Sure. Let's start with our contract, which says that the utility, that the Winform has to announce what its schedule, what its delivery will be in advance and do it on an hourly basis. Is that in your contract? Yes, yes.  Yes, it's in the Section 4.4 of the contract. So whatever they do, you now have to – Dynamic scheduling. Whatever they do, you now have to – Portland now has to purchase all of their power, correct? Correct. Okay. So where does dynamic scheduling – why do they want dynamic – I'll ask them this. Since they have to – since Portland has to buy all of its power, what is dynamic scheduling? What is it and what does it add to it? What dynamic scheduling would do, and there are various forms of dynamic scheduling, but what dynamic scheduling would do would be to adjust the requirement that we take their power on a roughly instantaneous basis. One form of dynamic scheduling is 15-minute scheduling, and another form that is to establish – So what I don't understand is it's not what dynamic scheduling means. It's kind of real-time. It means you do it in real-time. Close to real-time. As close to real-time as you can get. But what I don't understand is if the idea behind dynamic scheduling is getting as close to real-time as you can get, let's just stipulate that that's what it is, and there's an obligation that you take everything, what's the advantage of getting close to real-time if you have to take everything anyway? The advantage – what's the advantage to them? Yeah. I don't see that there is – What's the disadvantage to you then? What's the disadvantage to you then? The disadvantage is that we have contracted using the state-approved contract for a flat product that allows us to predict what other resources we'll be able to call on, we'll have to call on, to fill in the gaps. This is essentially a contract. It's certainly a contract. I thought from reading the brief that dynamic scheduling was something Portland would do to accommodate variable – power from a wind farm, so that since Portland had to buy it all, that when – I assume, maybe this is wrong, that with dynamic scheduling that was, that when power from Portland came to Portland – power from Patu came to Portland because the wind was blowing, that dynamic scheduling would automatically reduce the power from your other suppliers. Not true? No. It would automatically allow for their power to be received by us, but their dynamic scheduling is an ancillary transmission service that's provided within the Portland general system. It's not a service that's available to a party that's not a transmission customer. And Patu sells its entire output. This is a little screwed up at this point, because you're really arguing in opposition to Patu. You're going first. I agree. This really is a strange situation. I wonder whether – the problem is, the way this case is now, Judge Cable, Portland doesn't have any complaints. Exactly. I agree. And so you're really responding to Patu. Only because I was asked to. Okay, fine. Why don't we go on and hear from Patu, and you'll get a few minutes to respond to that. Very good. Thank you. Okay, let's go on. And maybe – is it Mr. Christensen? Yes, sir. Maybe you could start by just explaining something to me. If both the Oregon Commission and FERC have ruled that Portland has to take all of the wind farms' power, what's your complaint? So our complaint – and for the record, I'm Eric Christensen representing Patu. The complaint is that FERC has only required 15-minute scheduling. That still leaves Patu required to purchase wind integration services from Bonneville, which means they essentially have to use scheduling. Let me just say something for a moment. FERC requires 15 minutes or do they offer that? I thought it was a little confusing for what happened at re-hearing, didn't it? So there was a – we filed a complaint to enforce these orders asking for dynamic scheduling. FERC said 15-minute scheduling was close enough. I thought they offered it, and FERC grabbed it. Well, the – Is that correct? No, the 15-minute scheduling didn't come about until after we litigated this case. I know, I know, I know. I understand. But isn't it correct that at re-hearing that your opponent offered the 15-minute scheduling, and FERC said that's fine? Well, that's kind of where we wound up as the bottom line. The reason that we're here is because that doesn't work. You don't think 15 minutes is adequate? The 15-minute reduces the unnecessary scheduling cost, but it doesn't eliminate them. Why do we have any jurisdiction over that? That's a question. Let me finish my question. That's a question of what the state regulation means and the Power Purchase Agreement. It's respectfully discreet, Your Honor. I thought you might, but why? First of all, we independently brought a Federal Power Act claim that FERC improperly ignored in this case. We provided clear evidence that Portland General is discriminating against... Wait, wait, wait. Don't go on. That's the second part of your case. My question is about this 15-minute issue and your argument about... I take it dynamic scheduling would solve that problem for you, right? Yes, dynamic scheduling would solve the problem. But my question is, we only have jurisdiction. As I understand the way the statute is structured, the only situations under which this court would have any jurisdiction at all would be if someone is challenging, if you were challenging Oregon proper regulation, which you aren't, or if this related to Portland's transmission service, which it doesn't. No, it doesn't. With respect, Your Honor, I mean, Ms. Tracker described dynamic scheduling as a transmission service. It can be, but in this case, Portland is not your transmission provider. Bonneville is your provider. You're a supplier of power to... In other words, FERC says, and I don't see why they're not right, that Portland's transmission services are not an issue here vis-à-vis the wind farm. But the problem is that Portland has refused to accept dynamic scheduling, which defeats the whole process of getting the wind power from... But you're not... I'm asking, why is this a transmission issue? Because... Under the Federal Farm Act, FERC has jurisdiction over wholesale or transmission. Yes. FERC has said, contrary to the Oregon Commission, this is not a transmission issue. Your argument is rather convoluted. Your argument is that Bonneville had to somehow accommodate you at Portland's instruction, so that the transmission is the Bonneville transmission, not Portland's transmission. I think under the Federal Power Act, I mean, and FERC just ignored the precedent here, but under the Federal Power Act, once Portland General offers dynamic scheduling, the California ISO case that we cite in our brief requires them to include that in their open access tariff. In addition, under the Federal Power Act, these are core jurisdictions. But they didn't. They didn't. Which is error. That's why... So that's not a transmission question. Yes, it is a transmission question, Your Honor. Those cases, the Cal ISO case, is a transmission case. And it says that, I mean, the open access transmission tariff does govern transmission service. And it's required, once they offer dynamic scheduling, that they include it, which they haven't. FERC ignored that argument, although we raised it. That's the argument that FERC said, you raised too late, right? Well, that's one of the arguments, yeah. You raised it in an answer to an answer. Incorrect. We raised it in an answer to a motion. No, I just said that's what FERC said. Well, that's what FERC said. I mean, it's an indefensible answer, but that's what they said, yes. But if they're right about that, I mean, we have to defer to FERC's interpretation of its own procedural regulations. But you don't have to defer to when FERC asks you to call a motion to dismiss on the merits something that it's not. I see. Well, that's a good point. The essential question, even if you wrote it, is whether this is a transmission issue or not. Yes. And Fred Fable points out that the statutes are a little convoluted. Why, don't we have to defer to FERC's determination that this is not a transmission question? And it's convoluted to try to get through Bonneville? There's no determination in these orders that it's not a transmission issue, Your Honor. Oh, yes. In the order they did say, they disagreed with Oregon. They disagreed with Oregon? No, Your Honor. They said that the orders here were consistent with Oregon. Oregon said, this is a transmission issue. We have no jurisdiction. FERC ordered that. Well, that's clearly wrong, isn't it? Pardon me? That's totally wrong, isn't it? That's what FERC said? No, no. What Oregon said. No, because under Section 210H1 of FERC. I just don't understand. Just explain this to me. Okay. I don't understand. I don't understand how a seller of power, like the wind farm, is engaging Portland's transmission service. As I understood this, your transmission providers, Bonneville. That's right. And all the statutes and all the regulations, including 210H, talk about the transmission function of a utility subject to FERC regulation. So how does this relate to Portland's transmission function? FERC is repeatedly held. I mean, even Mr. Hacker said that the dynamic scheduling is a transmission service. It can be with respect to a transmission customer. But how can it be with respect to a supplier of power? That's my only question. How can it be with respect to a supplier of power? Well, the supplier has to move from the wind farm to the Troutdale Station. The problem here is that Portland has sort of built a wall around the Troutdale Station by refusing to allow dynamic scheduling. If it doesn't allow dynamic scheduling, it's blocking the chosen transmission function that would allow PAW-II to deliver all of its output. So when I ask you, I just want to make sure I understand. When I asked you at the beginning what your problem is with FERC's orders, since it's already said they have to purchase all your power, your problem is that under the 15-minute scheduling, that if PAW-II can't supply the power during that period of time, when it said it would, it has to buy it, right? Yes. That's what this – from your perspective, that's what the problem is, right? That's the problem that we're trying to solve here. Dynamic scheduling is what's solved. I get it. And that's – I just – so I understand the economic question. Your added cost here is part of the packaging cost that you have to go through at Bonneville to put the – now the power in the form of 15 minutes and kilowatts rather than megawatts, but kilowatts, right? Yes. All right. Your cost then is the packaging cost to create Bonneville, plus, if I understand correctly, plus what you charge Portland is a little less than your avoided cost for the power that you get from Bonneville. Is that correct? So the avoided costs are paid by Portland. What we paid at Bonneville is the transmission costs, and – So you had to pay Bonneville to get you that little extra power put in the package. Yes. Now that little extra power that you put in the package, you turn around and sell to Portland with your whole – with the stuff you generate yourself, right? Right. So – Well, the little – the extra amount you charge, you can only charge market price. You can't charge – Well, that's what – Portland pays us market price. We have to pay Bonneville whatever the price is. So you don't get avoided costs from Portland. That's part of the problem. That's part of your cost. Right. And the other part of the problem is that if – That's part of your cost. Right. Well, and there's also the problem of when the schedule is below the actual output of the product, the power just disappears into the system. It's not delivered, even though – And that problem would also be solved by dynamic scheduling. Just out of curiosity, how much money are we talking about here? How much is KOTU losing by having to purchase power that it turns out it can't deliver at the predicted time? It's in the range of hundreds of thousands of dollars. I don't know the exact amount, but – It's in the range of what? Hundreds of thousands of dollars. Let me ask you a question. Suppose the contract specifically said, as your adversary, your colleague says, suppose the contract specifically said, delivery shall be in the form of block power kilowatts every 15 minutes. What would your position be on that? I mean, if the contract actually said we have a specific obligation to deliver in a specific block, then we have to comply with the contract. That's not what the contract says. All right. So then ultimately this issue is a contract dispute. No, the contract issue has already been resolved by the Oregon Commission. They said there's no particular requirement for transmission. So this is a transmission dispute. Well, wait a minute. If the contract is silent on the issue, why does Portland have an obligation? Well, Portland, the court says, they have an obligation to take all your power. Under current buttons. Under current. But they don't answer the question whether or not dynamic scheduling is necessary. Yeah, I mean, that's the whole problem under the Federal Power Act part of this case. They just ignore it. And that would give us complete relief. Well, they don't ignore it in part because they don't see you as a transmission customer. I don't think that part of it is in the order, Your Honor, with respect. I thought it was in the description at the beginning. But in any event, that's incorrect because under the established precedent, the dynamic scheduling is a transmission service. They're obligated to provide it once they start providing it to their own resources. They're obligated to include it in their transmission tariff. And they're obligated to cooperate in establishing the links that are necessary to establish a dynamic schedule between bondholders. My final question is, FERC sees this as basically a FERC issue, masquerading as an FBA issue. Don't we have to defer to that? No, Your Honor. I mean, FERC has an obligation to, when we presented clear evidence of discrimination on the part of Portland General, they have an obligation to consider. To discriminate your discrimination claim assumes you're a transmission customer. No, Your Honor. I mean, it assumes we're taking interstate transmission, and that's all that's required. The transmission customer issue. You're taking it from out of it. It would be a transmission service from Portland to the dynamic scheduling because there has to be this essentially electronic link that allows Bonneville to move the power from our wind farm into the Portland General system. That dynamic scheduling is transmission. FERC ignored that, and that's the Federal Power Act error in this case. Do you have any complaint about the FERC? No. I mean, other than the post hoc rationalization that says it's not a binding order, that's clearly rejected by the FERC itself. It said, in fact, we're ordering Portland General to take all net output from Bonneville. Those words are clearly in the order. So, where does that take you? So, that takes us to the binding order and the enforcement order that says they have to get 15-minute scheduling. Do you object to the FERC not giving a tough enough order? I don't object to FERC not giving a tough enough order. I object to FERC counsel reinventing the order, reinterpreting it to something that FERC didn't say. Do you have any complaint with FERC's order? The complaint with FERC's order is that they ignored our evidence of discrimination under the Federal Power Act. That's under the Federal Power Act. I'm asking whether you have a complaint about FERC. Not with the FERC order itself. You like the FERPA part of it. I like the FERPA part of it. You just want it underscored by FERC counsel. Yes. I think the only problem we have is that FERC counsel has mischaracterized the order here as non-binding, which is just not the case. What do you do with Midland? So, Midland. Midland, I mean, it's virtually identical. I beg to differ, Your Honor. In Midland, the order's under review there. So, notice this is really typical, and there's dozens of FERC cases that have this same language. Notice it's hereby given that the commission declines to initiate an enforcement action under Section H2A of FERPA, and it directs Midland to go to the appropriate court. There's no such language in this order, and if FERP really meant to do just an advisory order, they clearly knew how to do that. So, if our opinion says it's advisory, doesn't that solve your problem? Pardon me? If our decision, whatever we issue, says it's only declaratory, that doesn't solve your problem. That's not what you want, right? No, that's not what I want. We want it mandatory. We want a mandatory decision, absolutely. Okay, but even if it's, let's assume we thought you were right, it's mandatory, I still don't see why we have any jurisdiction because it seems to me to be a FERPA order. So, under Section 210H1, this court clearly has jurisdiction because under Section 210H1 there are two types. Because you're back to the FBA. Right. And so that Section 210H1 says essentially if it's... I want you to know, counsel, whether we agree with you or not, you are a very good judge. With respect, Your Honor, I think it is a direct consequence of the language in Section 210H1. Just to be clear, the 210H1 argument was also one that was considered in Midland. Yeah. So, which was no, Your Honor, the 210H1, that was a 210H2 case. Okay, but the language is pretty parallel between H1 and H2. In fact, I think Midland itself talked about the fact that H1 and H2 speak similarly on this issue. So, I don't think Midland held that, but in any event, I disagree with the premise that the language is similar. In fact, 210H1 says if it's an order that's within FERC's Federal Power Act jurisdiction, then it's treated as a rule under the Federal Power Act and enforced in the same way, which means, among other things, that this court has jurisdiction under Section 313 and that we have the right to enforce the order under Section 317, which is what we're trying to do. But that's basically what Midland said about H2. But H2 is different because that H2 has to do with the Midland non-regulated utilities implementation of FERPA. This is not a – we don't have any beef with the OPC's implementation of FERPA. What we have a beef about is the Portland General's refusal to provide dynamic scheduling transmission service. All right, but bottom line, this contract was legitimately read as allowing Portland's position for 15 minutes and no further. Then you're out of all courts, right? No, Your Honor, because we have an independent route to dynamic scheduling through the requirements of the Federal Power Act, Order 888, and so on. In other words, you're arguing such a contract would be illegal? No, such a contract – I mean, I think what happened here is the contract doesn't – I'll give you my hypothetical. Okay. Suppose the contract specifically says that all that Portland is required to do is take power in 15-minute blocks. If that's really what the contract said, then – You're out of all courts. I think in that hypothetical, what we'd do is go to FERPA and say this contract is contrary to FERPA. We'd have to get a declaratory order. We'd have to go back to the U.S. District Court in Oregon to challenge the – The bottom line would be if the contract said that, it would be illegal? Yes. I wonder why you didn't just say that right at the outset. I didn't follow your question very well to begin with, Your Honor. I apologize. All right. We'll hear from the Commissioner. Thank you. Good morning. May it please the Court, Elizabeth Freilander for the Commission. As the Court has correctly discerned, this case does not present a transmission issue but a FERPA issue. And FERPA did, in fact, issue declaratory orders. What about counsel's argument that dynamic scheduling is a transmission matter? Your Honor, transmission is beyond the scope of this case because the standard contract from Oregon does not govern it. This is a finding of the Oregon Commission, and FERPA agreed with it. FERPA has never previously required the use of dynamic scheduling in this context, and FERPA found that the case does not require it to do so here. My final question is, is dynamic scheduling a transmission question, which is his fundamental argument? That's his argument. When I asked him, I said, look, you're a seller. Portland is not your transmission provider. You're not a transmission customer. His answer is dynamic scheduling is a transmission matter. It's part of transmission. It's within the transmission functions, Your Honor, yes. But it is not, as the Court has mentioned previously, TATU is not a transmission customer of Bonneville Power, and there's not a contractual relationship. Can you tell us what dynamic scheduling is? Dynamic scheduling is a means of real-time transmission of energy in which there is immediately You just used the word transmission. I'm sorry, Your Honor? I said you just used the word transmission. You shouldn't have used delivery. Yes, Your Honor. That would have been a better word. Okay. It is a means of scheduling transmission and delivery of power. And is it used for situations like where you have a wind farm or solar power where the power isn't regular? Is that where it's used? That's my understanding, Your Honor. And does it affect? Is it something Portland does with its own sources of energy in order to accommodate the wind farms? The record suggests that Portland does use it in some contexts, Your Honor. Do you think FERC understands transmission customers? Yes. Is that correct? Yes, Your Honor. But what FERC found here was that dynamic scheduling was not the problem highlighted by the complaint in this case or Portland's response to it. The issue was that Portland General was not accepting all the delivery of TATU's power. Both FERC and the Oregon Commission found in their orders, FERC in the initial order at paragraph 55, J.A. 534, the Oregon Commission in order 14, 287 at 14, J.A. 330, that the standard contract does not govern or restrict the means of transmission. Both commissions also noted that there may be more than one way to transmit TATU's energy, and neither commission weighted into the particulars of what was most appropriate. In other words, you've ducked the question whether dynamic scheduling was a necessary corollary to the proposition that under PERPA, Portland must take all of TATU's power. Under PERPA, Your Honor, it's not. Is that the right question? Under PERPA, Your Honor, dynamic scheduling is not required and never has been. But also, the contract, do you have an interpretation of the contract? Section 4.4 of the contract required delivery in hourly block increments. FERC found that that was unacceptable and that it set up a barrier to the delivery of all of TATU's power. I take it that's what you thought. So where does the contract stand now? FERC did not disturb the contract but held that Sections 1.13 and 4.1 of the contract, which governed Portland General's purchase obligation, must be read along with Section 4.4 and that Portland was required to accept all of the power of TATU delivered to it. In other words, the statutory provision undermined, to a certain extent, the notion that Portland had as to what the contract meant. But you never answered the question, how much? What do we do? We leave this for somebody else. The facts of this case, Your Honor, are very specific and there are any qualifying facility in a situation like the one TATU finds itself in has recourse before FERC. Any other qualifying facility can come to FERC and say, the utility has thrown up obstacles to our delivering power and we need help removing those obstacles. In this case, FERC did find that Portland had incorrectly structured its delivery requirements to inhibit TATU's delivery of power. And the orders challenged here, FERC found that Portland General had to accept all of TATU's power one way or another. It didn't specify what way Portland General had to do that. In the second complaint order, which is not on review here, the Commission found that Portland General's use of 15-minute scheduling blocks and permitting delivery in kilowatt hours resolved the problems at issue here. TATU did not challenge that on re-hearing. I'm a little confused about that. I was trying to figure out from counsel where the 15 minutes came from. The 15 minutes came not from the orders on review here, but from the second complaint order. Yes, but who came up with the 15 minutes? FERC or Portland? I believe Portland did, Your Honor. So it's sort of an offer to resolve the issue? I believe so. I think it's also in conjunction with a separate rule, FERC's Order 764, I believe it is, which is also not challenged here, that governs... So are you saying that a second order mooted the first? Yes, Your Honor, I think it did. Did you make that argument in the brief? We did argue in our brief that the events described in the second complaint order have overtaken the events in the first. We did not use the word moot, Your Honor. That helps. I wish I had, Your Honor. So your position, FERC's position is, we need to make sure I understand this, that under the state's FERPA regulations and the FERC Power Purchase Agreement, Portland must take all of PATU's power. Yes, Your Honor. And the fact that because of the 15-minute scheduling, PATU may have to go out and buy more expensive power to meet its obligations is simply a FERPA question, right? Yes, Your Honor. Okay. But I realize I don't think they make this argument, but isn't there a pretty fundamental... And the FERP regulations permit that, right? Yes, Your Honor. Isn't there, I mean, the statute says in 210A, the FERP is supposed to issue regulations that encourage small power production. Yes. And if the wind farms are losing a huge amount of money because Portland and other purchasers are requiring them to schedule their power in these 15-minute increments, which means they've got to go out and buy more expensive power, I mean, that may make this whole system unprofitable to them. So maybe there's a defect in the FERP regulation. Has anyone ever litigated that? Not to my knowledge, Your Honor. What do you think about that issue? The record does indicate here that PATU chose to sell its power to Portland General, which is a distant utility, as opposed to Bonneville Power Association or to Wasco, which is a local utility, because it could receive a higher avoided cost by doing so. So to the extent that PATU is taking on additional costs, presumably it's deemed that that's economically worthwhile. Can I ask a question about this? So your argument at the end of the day is that we don't have jurisdiction. Correct, Your Honor. And so just on the text of the jurisdictional statute, so 825LB is the relevant provision? Yes, Your Honor. It speaks in terms of judicial review. And it says that any party to a proceeding under this chapter slash act, let's say act, any party to a proceeding under this act, agreed by an order issued by the commission in such proceeding, may obtain a review of such order in this court. Yes, Your Honor. And the part of that that's lacking is that this is not a proceeding under this act because it's a FERPA proceeding? That's correct. FERPA found that this case could be resolved entirely under FERPA and not under the Federal Power Act. So I have two questions. There's two separate questions here that I was confusing. One is what you regard as your jurisdiction, and the second is what is our jurisdiction. They don't necessarily correlate, do they? They do not. But your argument, the argument that you've made in your briefs to us, is that we lack jurisdiction. Yes, Your Honor. And this is the provision that defines our jurisdiction? Yes, Your Honor. The Federal Power Act Section 313 does not apply to FERPA cases because of the difference you've mentioned between chapter and act. So is that your basic argument at the end of the day is we don't have jurisdiction because the way FERPA resolved the proceeding before it, it turned out to be a FERPA proceeding, not an FPA proceeding? Correct, Your Honor. And it doesn't make any difference under the theory whether the FERPA order was declaratory or not, right? Not really, Your Honor, no. Right. It makes no difference. No, Your Honor. I have two follow-up questions if I could just underline. One is if the party who brings the proceeding before FERC says I've got some FPA claims and then FERC resolves the case on FERPA grounds, the way you must be construing the statute is it doesn't matter that the party brought it as an FPA case. All that matters is what FERC chose to do with it, and FERC chose to make it into a FERPA case. Ergo, the judicial review provision doesn't apply. That's the way you read the language? Yes, Your Honor. FERC has broad discretion to manage its own dockets, and as it understood this case, it raised only FERPA claims. Okay. Then let me ask this one follow-up question, which is under 825LA, which deals with re-hearings, that says any person agreed by an order issued by the commission in a proceeding under this chapter, which I assume is supposed to be ACT. I don't know for sure, but I'm just going to assume that it is, can speak re-hearing, can apply for re-hearing. Correct. I'm just trying to square these two. If you thought under B that because FERC treated it as a FERPA proceeding, we don't have jurisdiction to review it, then wouldn't the fact that FERC treated it as a FERPA proceeding for purposes of A mean that there was no FERC jurisdiction over re-hearing either? That's an interesting question, Your Honor. You didn't treat it that way because you actually decided the re-hearing petition. Yes. The issues on re-hearing did include Federal Power Act arguments, and I think in that case the commission's safest and most prudent course was to consider the re-hearing arguments and evaluate them again. But for a second time on re-hearing, FERC found that the issue was not Federal Power Act related but FERPA related. So do you understand my question, which is that if FERC, if as you say FERC thought that it was FERPA related and not FCA related, and that means for B we don't have jurisdiction, why doesn't it mean for A that FERC doesn't have jurisdiction over a re-hearing petition? So if I understand your question, Your Honor, are you asking why FERC issued a re-hearing order in the first place? Right, because I'm understanding the way you read B. That means we don't have jurisdiction because you treated it as a FERPA proceeding. Yes, Your Honor. Then wouldn't the logical consequence of that also be that FERC didn't have jurisdiction over the re-hearing petition? FERC did not interpret it that way, but I see, I understand your argument. Uh-huh. I can't say exactly why FERC did not see it that way, but FERC did not. I'm a little puzzled about the jurisdictional argument here. If, let us say, when we ask whether a party is agreed, we assume the merits of the argument, right? Yes, Your Honor. You all agree there's a form of standing, right? Yes, Your Honor. Okay, the merits of Winform's position is that this was an FPA problem because there was discrimination in transmission. Yes, Your Honor. Why would we not have jurisdiction over that question? The court would have... I mean, you could have done it right, but why wouldn't we have jurisdiction? The court does have jurisdiction over questions purely of Federal Power Act, as Your Honor is saying, but in this case, FERC viewed this case through the lens of FERPA. You may have legitimately decided the question, using the statute back and forth, and concluded this is basically a FERPA case. But I'm just going to the jurisdictional issue. I don't see why Petitioner Winform doesn't have jurisdiction in this court because all the question is whether they're agreed. And their argument is that FERP illegally, improperly, ignored the FPA issue because it's a transmission question and there's been discrimination in transmission. If that were true, wouldn't it be clear that we have standing? I mean, that we have jurisdiction? Yes, Your Honor. But then I assume your position is... I'm glad you asked it that way because I take it... I was going to ask you if you would prevail here would the first sentence of our opinion say, we lack jurisdiction because the order was declaratory or we lack jurisdiction because this is a FERPA case? And I take it in response to Judge Sullivan's question, your answer is to say the latter. Right? We lack jurisdiction because this is a FERPA case. Because this is a FERPA issue. Right? Yes, Your Honor. So all that stuff in your brief about this being declaratory only, we should ignore that. It doesn't really affect our jurisdictional issue, right? No, Your Honor. But... Wait, wait, wait. I thought it did. Because I thought that the... I thought your point... There's two ways... Middle of the devil with this. There's two theories under which we have jurisdiction. One is to say that it's a proceeding under this Act agreed by an order. And the answer to that is it's not a proceeding under this Act because we treat it as a FERPA proceeding. But then there's another route, which is to say, well, under 210H, the fact that it's a FERPA proceeding doesn't answer it because it converts everything that's FERPA into an FPA. As to that, you go to declaratory because you say, wait a minute, it's got to be an enforcement. And it's not an enforcement for H purposes because it's declaratory. We're not doing all the stuff we normally do in an enforcement proceeding. Therefore, you don't get it under the 210H route either. Am I not understanding correctly? Okay. That is correct, Your Honor. I think I am misunderstanding the line of questioning here. Okay. So as this Court laid out in Midland, Section 313 of the Federal Power Act does not give the Court jurisdiction over matters arising under FERPA Section 210H because of the way 313 is structured. So the statute cannot try to string together a theory under which there is jurisdiction under Federal Power Act Section 313 because the Commission mentioned FERPA Section 210H. In other words, it's not just because 210H speaks in terms of FERPA issues being FPA issues, speaking in general terms. That's correct. That's not enough to give jurisdiction under 825L. That is correct. Section 313 of the Federal Power Act does not confer jurisdiction in that situation. But in any circumstance, the Commission's orders here were not attempting to enforce any rule but just to state FERPA's views on the dispute at hand. The Court will also lack jurisdiction when FERPA is not attempting to enforce a rule. What do you think about Mr. Christensen's argument that the order here is different from Midland and that this one is, in fact, that you, the counsel, is mischaracterized? That this rule, unlike Midland, is, in fact, mandatory? I don't understand his argument that this order is mandatory, Your Honor. Just as in Midland, FERPA did not provide any specific guidance as to how Portland General was to comply with the order. It did not specify a deadline for compliance or impose any consequences of not complying. And certainly, FERPA did not require that the parties follow up on the order, for example, when making a complaint. Did you, in the reconsideration order, specifically say 15 minutes complied with the FERPA obligation? That was in the second complaint order, Your Honor, which is not on review here and for which patch you did not seek rehearing. So that finding is, yes, FERPA did make that finding. That finding is not on review here. I know it's not on review, but that goes back to the question of whether or not the issue that was put in place before us is moved. I would say the issue is moved, Your Honor. And moreover, patch you has taken FERPA's two orders. Yes, Your Honor. Patch you has taken FERPA's two orders, the same ones for which it has sought review here, and is attempting to enforce them in federal district court in Oregon. Well, why would they want to enforce an order of FERPA that says 15 minutes is okay? Because that's what Portland is offering now, and that's what they're doing. I don't get it. Well, is Portland not complying? I thought counsel for Portland said they are taking all of patch you's power. Yes, Your Honor. Then why is patch you in court trying to enforce an order that the other side is obeying? Respectfully, Your Honor, I think you need to ask that question. Let me just ask you. Respectfully, Judge Tatel, I think that question is better posed to patch you, but my own reading of it is that the orders are not that bad. Okay. Unrelated, but maybe related question. With respect to patch you's claim about discrimination and violating the standards of conduct, FERC's order addresses both of those under merits, right? They say it's not discriminatory, correct? That's right, Your Honor. But if it's not a transmission customer, shouldn't FERC have said we just don't have jurisdiction over this? FERC would have had that option. If it doesn't have jurisdiction, it doesn't have jurisdiction. Like us, it can't decide a case over which it has no jurisdiction. If patch two is not a transmission customer, shouldn't FERC have simply said petition dismissed? We don't have jurisdiction. FERC had that option, Your Honor, but it chose to provide an advisory opinion saying that we don't think it's a transmission customer and we do not see any violation of the standards of conduct here. I see. So that part of it was also advisory. Why does FERC do that? Isn't FERC busy enough so it doesn't have to? Why is it issuing all these advisory opinions in mandatory terms? I mean, it's totally bizarre the way they're doing it. They either, if they're declaratory, why don't they say they're declaratory instead of writing them as mandatory? I know you're not at FERC. You're the lawyer, so maybe you don't know the answer. And even more fundamentally, why are they issuing these advisory opinions? I don't get it. What's the reason for that? In the CLIPA H-1 and H-2, 210 H-1 and 210 H-2 setting, Your Honor, parties do sometimes take FERC's, can and sometimes do take FERC's advisory opinions to district court, which is another reason this court does not have jurisdiction. Once the commission has provided its opinion, then that would mean that this court was simultaneously reviewing FERC's position at the same time the district court was considering it. Can I ask this question, though, to follow up on Judge Gilles' question? So if FERC did provide, let's say, advisory guidance on the standards of performance discrimination claim, that's a claim under the FPA. Yes, Your Honor. So if that's a claim under the FPA, then getting back to our jurisdiction, the statute says any party to a proceeding under this act, meaning the FPA, can bring a petition for judicial review before us. Yes, Your Honor. So why doesn't, why isn't there jurisdiction for us to review FERC's order, given that FERC did pronounce on an FPA issue? Again, Your Honor, the, although there were FPA federal power questions raised in this case, the commission chose to view it solely through the lens of FERPA. There was, but even as to the, I thought as to the standards of performance, that if that's not a FERPA answer, that's an FPA answer, that there's not discrimination. I didn't understand, am I wrong? There is not discrimination, and part of the reason for that is the statute is not Portland General's transmission customer. Well, this does, that's why, excuse me, that's, that's why, am I right that, so FERC's declaratory ruling on discrimination was, this would not be discrimination if TATU were a transmission customer. Right? Because if it's not, if it's not a transmission customer, then this anti-discrimination provision in the statute doesn't apply, does it? That's right. It's not applicable. Right? Yes, Your Honor. Yes, it doesn't apply? Huh? I'm sorry, Your Honor, I'm a little confused by the question. Okay. I'm looking through the statute. Do you know, I mean, are you familiar with the Abbott and Costello routine, who's on first? Yes, Your Honor, I am. It's awful close. I think the question, I think that Judge Tatel's question is, if the answer to the transmission issue that we started off with early on in the argument is that Bonneville intercedes, and so therefore that makes PA-2 not part of the transmission apparatus, then why are we even talking about anti-discrimination vis-à-vis PA-2? Wouldn't that also be an answer to that, to the discrimination part? Wouldn't it also take PA-2 outside of the field of potential discrimination claimants, too? I thought that was the question that Judge Tatel asked. My question is, Section 205 says, can't discriminate with respect to transmission or sale of electricity subject to federal jurisdiction. Transmission or sale of electric energy subject to transmission. That's not this case, right? This isn't transmission, it's not a sale. That's correct, Your Honor. This is not a transmission case. Okay, so then FERC has no jurisdiction under what FERC should have said with respect to PA-2's complaint, is dismissed because of no jurisdiction under 205. It's not a transmission or sale of electric energy subject to commission jurisdiction, right? I mean, you're still in your case, but isn't that what FERC should have done? If it isn't, then I don't understand what's happening here. FERC could have chosen to do that, Your Honor, yes. But FERC did suggest in its opinion that it was not a threat, that PA-2 was not a transmission customer. Yes, FERC did find that PA-2 was not a transmission customer. But it didn't take the next logical step and say, since it's not a transmission customer, this is not a transmission case, therefore we don't have jurisdiction under FDA. FERC could have chosen to do that, Your Honor, yes. Where did it say that PA-2 is not a transmission customer? That is in both the complaint order at paragraph 56, J.A. 651-52, and the rehearing order of paragraph 57-59, J.A. 652-53. Okay. If the Court has no further questions, we'll be happy to rest on a brief. She said there were no further questions. Oh, I'm sorry. I was entertaining a question from Judge Silverberg. I thought you were asking me the question. Anything else? No. Okay. Thank you. Thank you, Your Honor. Thank you very much. I think, was, did counsel have any time left? Okay. You can take two minutes, Mr. Kucinich. Thank you, Your Honor. And thank you for your consideration. Well, now that this is all perfectly clear. Yeah. Let me see if I can provide a little bit of background information and context. The contract that was entered into between PA-2 and Portland General wasn't the contract of Portland General's manufacturer. It was the state-approved FERPA contract for, it was the standard contract. And the state had a provision that said, if your operational needs, if your commercial needs, or if your sense of preferences urges you, as the wind farm, to want different terms and conditions, you have that right, and we will supervise the negotiations of that, to make it a nonstandard contract. We wouldn't have had to have, in the standard contract, any other kinds of scheduling provisions than the one that already was present, which was, we'll purchase your deliveries after you pre-schedule them. That's specifically in the contract? Yes. That's what section 4.4 of the standard contract. That's your standard contract, right? That's the standard contract. Which the state has approved. Excuse me? Which the state utility commission has approved. The state approved, I think it was back in 2007, three or four years before the contract was signed. So then, isn't your complaint, I hear what you said about the problem with the wind farm being required under the standard contract to purchase more expensive power to meet its delivery obligations because of this 15-minute thing, right? I get that. But isn't your complaint then that the FERC regulation, by tolerating that, itself violates 210A, because it discourages the production of this power. In other words, your complaint is with the regulation which allows it. Wait a minute. That's the other side of the complaint. No, the FERC regulation and the contract permit Portland to impose this 15-minute obligation on you, right? Yes. Okay. That's why I asked. The 15-minute obligation is one of our obligations. Isn't your complaint with respect to the FERC regulation that doesn't prohibit that? In other words, your argument should be that, look, FERC, you're discouraging the production of this alternative energy. That might be my argument if I was arguing for the wind farm, but that's not what I'm arguing for. I'm sorry. I'm totally sorry. I'm a good guy in this case. I'm sorry. I'm sorry. If I was asking the question to the right person, what would his answer be? I'm totally, it's my mistake. I'm completely sorry. I get it. Okay. The other feature is, and I think it's something. What about the movement question? Why didn't you get up and say this case is moving? FERC has said in their reconsideration that 15 minutes is fine. Because there's uncertainty about whether the FERC's order actually was intended to be an effective order or whether it wasn't. But as long as it's effective or not, their final position is one you're happy with. As long as you accept that final position. It's not even promised. But maybe the case is moved because of that. That's what's puzzling me. It may have become moved, but we have to change our behavior. We have to change our behavior. Counselor, why doesn't anybody say the case is moved? Because there's been a separate proceeding in which FERC has said 15 minutes is fine. That satisfies the obligation to take all of Wynn Farms' property. Because we had to change our billing practices and our payment practices in order to achieve that result. That's not the result we wanted. Yeah, but now that you're happy. Now we're all happy with it. Wait a minute. Are you challenging it? The FERC said that we were in compliance with their directives. It was not a matter of us. Counsel, you're not objecting to their 15-minute order because you yourself have offered it. Is that correct? We offered it as a matter, as a result of what we thought was their compulsion, not as a voluntary. Let me ask this. For purposes of this proceeding, you're happy with FERC's treating the orders that we're now reviewing as declaratory only? We're content with that. You're content with that. But is what you're saying that you wouldn't, had you known that at the time of the 15-minute order, the second complaint that's not before us right now, that you would have acted differently in that case? Had you known that the orders in this case are only declaratory? Yes. The only reason that we went to this 15-minute schedule and this change of billing practices was because we were trying to conform to what FERC characterized as its directives to avoid the penalty of a million dollars a day for not conforming. So you acted the way you did in the second proceeding that resulted in the 15-minute order because you felt like you were under compulsion under these orders. Now that you've been educated and realized that FERC believes that these are not compulsory but they are declaratory, then you're saying you would have acted differently in the 15-minute proceeding? Is that? We probably would have acted differently. We may yet act differently. I thought that order is final now. Nobody sought review, right? Nobody sought review, but the only reason we acted that way was because we thought these orders were mandatory. I see. But now that you realize they're declaratory, you now have a question whether you want to agree to the 15 minutes or not. Precisely. But whatever you do with respect to the 15-minute, you are obligated, correct? Portland is obligated to purchase all their power, right? We are obligated to purchase under the contract all the power that they deliver pursuant to an hourly schedule. And that they rely on. When you say pursuant to an hourly schedule, that just goes right back to your original argument of 4.4 trumps everything else in which everybody has that. The state commission found that that was the governing provision, and then FERC got involved in interpreting the state approved contract. I think your chances of getting out of the 15 minutes are vanishingly small. Maybe. Okay. Let's hear from Mr. Christensen so I can ask him my question instead of to you. Perfect. Thank you for your consideration. Mr. Christensen, you can have two minutes still. Thank you, Your Honor. Let me address, first of all, the transmission customer question. You'll get around to my question eventually. Go ahead. You can talk about transmission. Okay. Let me talk about transmission customer first, and then I'll try to answer your question. But you'll have to remind me because I kind of lost the thread there. So transmission customer, in fact, if you requested transmission service, requested dynamic scheduling service from Portland General, they were refused. Wait. You requested dynamic scheduling, correct? You didn't request transmission service. It is transmission service. No one in this courtroom has so far been able to explain to me what. Maybe if you could explain to me what dynamic scheduling is. So basically, dynamic scheduling is a computerized system that allows the power to be delivered as it's produced from the wind farm across the Montreal system to the Portland General system on a real-time basis. Right. So it allows you to supply power to Portland General on a real-time basis. Yes. That's not a transmission question. Yes, it is. I beg to differ, Your Honor. The CALISO case that's cited on page 28 of our brief holds that directly. It says, the details about dynamic scheduling contained in the standards are practices that may affect the terms and conditions of transmission service significantly, and therefore, under the commission's rule of reason must be filed under section 25 of the CALISO case. The CALISO, the California ISO, which is the transmission entity serving California. Right. Even if you're right, that's possible. It's doing the transmission. Yeah. Right. No, it's Portland General. In this case, California, the California ISO is the receiving balancing authority. The same as Portland General is the receiving balancing authority. Okay. And in any event, the transmission customer definition in FERC's regulations says, any eligible transmission customer, even a person who's only just seeking information about transmission. It doesn't say you have to be a transmission customer of a particular utility in order to receive the protections of the Federal Power Act. In fact, it says just the opposite of that. Any transmission customer, it prohibits discrimination against any eligible transmission customer. It doesn't matter. And it has to be that way because otherwise what the result of this case is that Portland General's merchant function can basically build a wall around their service territory and defeat all competition in the wholesale power market. And that's the whole point of order 888. In addition, I think that FERC abused its discretion by ignoring our Federal Power Act claims. That gives this court jurisdiction under section 313, regardless of how the. Discrimination. Yes. But that all turns on whether if you are, in fact, a transmission customer, you're right. Well, they didn't ignore them. They decided the discrimination issue against you. Right. Should they have decided it at all since if, if Patu is not a transmission customer. Patu is a transmission customer. So we're right back to where we were. Yeah. So what about my question? Is it your complaint really with the FERC regulation that allows Portland to impose this 15 minute obligation on you? Our complaint is. That's what your complaint really is. Isn't it? With the. I'm sorry that. Well, we have two complaints. One is that. I'm not talking about your complaint in this case. Yeah. Okay. I'm saying your real complaint. It seems to me is that FERC regulations tolerate or don't prohibit these 15 minutes. Requirements because those have the opposite effect of quote, quote, encouraging the delivery of this kind of alternative energy. Isn't that right? Well, our complaint with Portland in general is. I'm asking you, it's like a hypothetical. Okay. I mean, isn't, as I understand your complaint here, what you're, I don't mean complaint in terms of the document. Yes. You're Patu's basic problem here. Is it, is it, it has to buy more expensive power to meet the 15 minute obligation of the contract. Right. Yes. And my only question is, that sounds to me like your, your problem is with the FERC regulation that tolerates that. And what you should be doing is going to FERC and saying, this regulation is inconsistent with a two 10 a, because it does not quote, encourage the development delivery of this alternative energy. In fact, that puts a big disincentive on it. Well, in fact, that's basically the, the, the FERC part of our complaint was basically that, but also the regulations under the federal power act and order eight, 88 specifically require dynamic scheduling to be included in that. Oh. And so we would have had, if FERC had not abused his discretion, in this case, we would have been able to reach dynamic scheduling through the federal power act route. Anything else? No. Thank you. Case is submitted. Thank you.
judges: Tatel, Srinivasan, Silberman